IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA MUNICIPAL | ) | |
| INSURANCE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  2:06cv291-CSC |
| | ) | |
| ALABAMA INSURANCE UNDER- | ) | |
| WRITING ASSOCIATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  Introduction**

On August 17, 1969, Hurricane Camille destroyed a substantial portion of the Gulf

Coast of the United States.  With 200 mph winds and a 25 foot storm surge, Camille was

> a bench mark in the American hurricane experience. Although Camille hit an
> area that had a relatively small population by today's standards - it still
> provided a horrific firsthand lesson of what a hurricane of maximum intensity
> can do to the man-made environment.  . . . Hurricane Camille remains the
> strongest storm to ever enter the United States mainland on record.

Michael A. Grammatico, *Hurricane Camille,* June, 2003,
http://www.geocities.com/hurricanene/hurricanecamille.htm.

As a direct result of the devastation left in Camille's wake, and  relying on the

guidance of the Alabama Attorney General, the Alabama Department of Insurance, through

the Commissioner of Insurance, organized the Alabama Insurance Underwriting Association

("Association") to provide for continued  insurance coverage for properties in Alabama's

coastal area.  There was no specific statutory authority to create the Association; it was

created by regulation.  (Dep. Tharpe Forrester at 9-10, 14).  On July 10, 1970, Department

Regulation 52 became effective and created the Association which is commonly referred to

as the "Beach Pool."[1]

The Association provides insurance coverage to properties in Alabama's coastal area

by requiring members to participate in

> the Association's writings, expenses, profits and losses in the proportion that
> the Net Direct Premiums of such Member written in the State during the
> preceding calendar year bears to the aggregate Net Direct Premiums written
> in the State by all Members of the Association factored as prescribed by the
> Board.  The Commissioner shall certify to the Association, after review of
> annual statements, other reports, and any other statistics deemed necessary, the
> aggregate Net Direct Premiums written by all Members.  A Member shall,
> subject to compliance with all applicable Association rules and procedures,
> receive an annual credit (factored as prescribed by the Board) for Essential
> Property Insurance voluntarily written in the Beach and Seacoast Areas, and
> its annual participation in the gains and losses of the Association shall be
> adjusted accordingly.

(Plan of Operation, Sec. IX, ¶ 2, p. 12).

To receive the annual credit, a member must file an annual claim report.  All of

Plaintiff Alabama Municipal Insurance Corporation's ("AMIC") claims in this action flow

directly from its failure to file its "Voluntary Writings Credit" claim report in a timely

manner which resulted in it being assessed $593,560 in 2004.  In this 42 U.S.C. § 1983

action, AMIC complains that the actions of defendants Robert Groves as the Chief Executive

Officer of Association ("Groves"), the Association and Walter Bell as the Commissioner of

---

[1] Although the terms "Association" and "Beach Pool" are used interchangeably, for fluidity and ease
of reading, the Court will primarily refer to the organization as the Association.

the Alabama Department of Insurance ("Bell")[2] unconstitutionally deprived it of its property in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

AMIC directly challenges the Commissioner's requirement that to sell property insurance in Alabama, an insurer must be a member of the Association.  It also challenges the validity of the March 31 claim report filing deadline.  Specifically, AMIC bases its challenges on these grounds: (1) the membership requirement and filing deadline are arbitrary and capricious; (2)  the membership requirement and filing deadline denied it substantive and procedural due process and equal protection under the law; (3)  the assessment constituted a unconstitutional taking of property; and (4)  the Association was created without statutory or legislative authority.[3]  AMIC also argues that the assessment

_____

[2] In the original complaint, the plaintiff also named the Alabama Department of Insurance as a defendant.  The Alabama Department of Insurance is not named as a defendant in the First Amended Complaint.

[3] In each count of the amended complaint, AMIC repeatedly frames each of its constitutional claims in broad, conclusory language.  For example, AMIC contends that

26.    This power, regulation, and/or procedure by which the Defendants have done this is arbitrary and capricious.  This regulation, statute, and/or procedure resulted in an unconstitutional taking and deprivation of AMIC's property in violation of the Fourteenth Amendment to the United States Constitution.

27.    The statute, regulation, and/or procedure adopted by the Defendants requiring a private entity to be a member of the Association in order to receive a license to sell insurance, on its face and as applied, violated the substantive and procedural due process rights as well as the equal protection rights of AMIC as guaranteed to it by the Fourteenth Amendment to the United States Constitution.

Doc. # 50, Amended Compl. at 7-8.

AMIC then parrots the "arbitrary and capricious" language and references the "unconstitutional taking and deprivation" of its property "in violation of its "substantive and procedural due process as well as equal protection rights  . . . as guaranteed . . . by the Fourteenth Amendment to the United States
(continued...)

violates the Dormant Commere Clause and constitutes a regulatory taking in violation of the Fifth Amendment and the "Equal Protection Clause of the Fourteenth Amendment." Finally, AMIC raises state law claims of breach of contract and "Exercise of Power in Excess of Authority."

The court has jurisdiction of the federal constitutional claims pursuant to its federal question jurisdiction,[4] 42 U.S.C. § 1331, and, it has supplemental jurisdiction of the state law claim pursuant to 28 U.S.C. § 1367.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

Now pending before the court is AMIC's motion for partial summary judgment (doc. # 62), defendant Walter Bell's motion for summary judgment (doc. # 64) and the Association and Groves' motion for summary judgment (doc. # 66).  The court heard oral argument on the motions on January 15, 2008.  After careful review and consideration of the motions for summary judgment, and the responses and the evidentiary materials filed in support of and in opposition to the motions, and argument of the parties, the court concludes that the plaintiff's motion for partial summary judgment is due to be denied, and the defendants'

---

[3](...continued)
Constitution" throughout the complaint.  *Id.* at ¶ 34-35, 40, 47-48, and 76-77.  After reviewing the plaintiff's pleadings in general and its complaint in particular, the court is compelled to observe that artless pleadings of this sort are of little help to the court or the parties.

[4]  Pursuant to 28 U.S.C. § 2201, et seq., AMIC also seeks declaratory judgments regarding the creation, existence and maintenance of the Association and the March 31 deadline.  "Of course, it is well established that the Declaratory Judgment Act does not, of itself confer jurisdiction upon federal courts." *Weitzman v. Microcomputer Resources, Inc.*, No. 07-12998, slip op. at 4 (11th Cir. Sept. 12, 2008).  Rather, the court must determine whether the plaintiff's claims arise under federal law.  *Id.*

motions for summary judgment are due to be granted.

## II.  The Summary Judgment Standard

Under FED.R.CIV.P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[5]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the

---

[5]  In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial...We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . .

*Id.* at 324.

5

pleadings, that a genuine issue material to the non-movant's case exists.  *See  Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991);  *see also* FED.R.CIV.P. 56(e).  ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248 (1986).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant.  *See  Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995)*; Peppers v. Coates*, 887 F.2d 1493 (11th Cir.1989).  However, *evidence* presented by the non-movant must be believed and all justifiable inferences must be drawn in favor of the non-movant.[6]  *Anderson*, 477 U.S. at 255.  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

---

[6]  "[W]hat is considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes."  *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

FED.R.CIV.P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

### III.  The Facts

The material facts are undisputed.  In 1970, following the guidance of the Attorney General, the Alabama Department of Insurance, through the Commissioner of Insurance, created the Association to provide insurance coverage for properties in Alabama's coastal area.  There was no specific statutory authority to create the Beach Pool; it was created by regulation.  (Dep. Tharpe Forrester at 9-10, 14).  On July 10, 1970, Department Regulation 52 became effective and the Association was established.  Of insurance companies doing business in Alabama in 1970, all but one joined the Association.[7]  (*Id*. at 13).  Insurance carriers "could write themselves out of any liability on the Beach Pool by voluntarily writing business within the beach area."  (*Id*. at 14-15).  The Association is considered the insurer of last resort.  (Dep. Walter Bell at 13).

The Association itself is a non-profit association which requires every participating insurer in Alabama to be a member.  In other words, in order to sell property insurance in the State of Alabama, an insurance company must be a member of the Association.  (Dep. Walter Bell at 13).  From its inception and up to 1987, an insurer could terminate its membership in the Association simply by giving the Association six months notice.  However, in 1987, that provision was eliminated from the Association's Plan.  Consequently, membership has not

---

[7]  The sole exception was the Church Insurance of New York company.  (Forrester Dep. at 13).

been voluntary since 1987.

The Association presently operates under the 2002 Plan of Operation and Articles of Agreement. Although membership in the Association is considered "voluntary," if an insurer doesn't join, the insurer will not be licensed to sell insurance in Alabama. No insurance company has ever withdrawn from the Association and continued to sell insurance in Alabama.[8] The Commissioner of Insurance has not had to decide whether to permit withdrawal from the Association because, to date, no company has ever attempted to "opt out" from membership in the Association.

The Association generally operates as a "profit and loss" sharing organization. An insurance company can "write" itself "out" of the possibility of assessment by the Association by voluntarily writing enough policies in the coastal area. A company who writes policies gets a "credit," which is used to calculate the company's participation share in the Association. If there are profits, the member company gets a share of the profits. AMIC has received profits in the past. If there are losses, the member company is assessed a share of the loss based on the amount of policies written. If there is no exposure, there are no assessments. If there is no extra money, there are no revenue distributions.

The implementing regulations require the "Voluntary Writings Credit Claim" to be filed no later than March 31 of each year. If a member company does not file its credit claim by March 31, the member company gets no credit for any policies it has written. The March

---

[8] In 1970, when the Association was formed, one insurance company was exempted from membership – the "Church Insurance Company of New York" which only insured churches.

8

31 deadline has been in effect since 1975.

The Association is regulated like other private insurance companies, and the Insurance Department does not direct or control the Association's day-to-day operation.  There is no state funding for the Association.  However, the Commissioner of Insurance approves both the rates and the forms used for the Association.  (Dep. Walter Bell at 10).

Plaintiff AMIC was formed as a non-profit corporation in March 1989 by the League of Municipalities to write insurance.  On September 6, 1989, AMIC signed the Association's membership agreement, and on September 28, 1989, it was licensed to sell insurance in Alabama.  In 1999, AMIC signed a second membership agreement.  In 2003, AMIC voted against extending the life of the Association because it disagreed with the composition of the Board of Directors.[9]  In 2006, it voted against extending the life of the Association because of this litigation.  It is undisputed that AMIC has never asked to withdraw from the Association, and it is presently a member.

Prior to 2004, AMIC had always claimed its voluntary writings credit.  (Dep. Steven Wells at 57).  The instructions for filing the voluntary writings credit claim contain the March 31 filing deadline.  (Dep. Kelly Jackson at 101).  AMIC did not file its claim by the March 31, 2004 deadline.  According to AMIC, it did not receive a reminder notice, and thus did not think about the Voluntary Credit Claim report until the first week in April 2004. AMIC admits that it had no calendaring system in place to track critical dates for filings.

---

[9]AMIC disagreed with the Board "being dominated by the big, private insurance companies."

Kelly Jackson, the AMIC employee responsible for filing the report, testified in deposition that she relied on the "reminder notice" to file the report.[10]  (Dep. Kelly Jackson at 94-95). When Jackson realized that she had missed the deadline, she called the Association.  Jackson contends that she was told the deadline was March 31 and that a late filing of the report "would not be accepted."  (*Id*. at 96-97).  Consequently, AMIC did not file the claim seeking its voluntary writings credit.

AMIC did not request a waiver of the deadline and took no further action until October 2004, when it was assessed $593,560.00 as its share of the losses of the Association for damage caused by Hurricane Ivan.  AMIC received no credit for any coverage it had written because it failed to file the Voluntary Credit Claim report.   AMIC paid the assessment on October 18, 2004, without protest.

In September 2005, AMIC began its efforts to recoup the $593,560 assessment. AMIC was denied a refund by the Association's attorney, on behalf of the Association, on September 28, 2005.  On October 25, 2005, AMIC filed an appeal to the Board of Directors. The appeal was denied by the Board on November 18, 2005.  On December 15, 2005, AMIC appealed the Board's decision to the Commissioner of Insurance.  A hearing before the Commissioner was set for March 1, 2006.  That hearing was continued until April 13, 2006. This action was filed on March 31, 2006.  The Commissioner held a hearing on April 13,

---

[10] Jackson admitted that she did not pay attention to the date, she had no calendaring system in place to remind her of the date, and she "thought she would get a letter."  (Dep. Kelly Jackson at 102-105). According to Wells, the President of AMIC, there was "a lot of stuff going on. And AIUA is, quite frankly, a small blip on the radar."  (Dep. Steven Wells at 66).

2006.  On June 6, 2006, the Commissioner affirmed the decision of the Board.

AMIC appealed to the Circuit Court of Montgomery County.  The Circuit Court sustained the Commissioner's decision on March 13, 2007.  The Alabama Court of Civil Appeals affirmed without opinion on August 17, 2007.

It is undisputed that March 31 has always been the deadline for the report.  Moreover, the Association has never allowed a late filing of the Voluntary Writings Credit claim report nor has it ever made an exception to the March 31 deadline.  AMIC has not, to date, tendered its 2004 Voluntary Writings Credit claim report to the Association, nor has it ever petitioned to withdraw from the Association.  (Dep. Steven Wells at 23-24, 42).

## IV.  The Claims

AMIC filed a partial motion for summary judgment (doc. # 62) on the basis that "the Association is unconstitutional pursuant to the Taking clause of the Fifth Amendment to the United States Constitution and the Equal Protection clause of the Fourteenth Amendment to the Constitution."  (Doc. # 63 at 2).  AMIC argues that its forced membership in the Association constitutes an illegal regulatory taking and violates the Equal Protection clause.

The defendants have also filed motions for summary judgment in which they contend that the court lacks subject matter jurisdiction over AMIC's complaint, and that AMIC has failed to allege state action sufficient to confer jurisdiction on this court.  *See* 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.  The defendants specifically argue that because the Association is not a state actor, there is no state action nor did the Association act under color of state law.  The defendants contend that AMIC's substantive and due process claims as

11

well as its equal protection claim must fail.  They argue that the Dormant Commerce Clause does not provide a basis for a private claim and that the McCarran Ferguson Act renders the Commerce Clause inapplicable.  Finally, they contend that neither forced membership nor the assessment itself constitutes a regulatory taking.[11]  The Association takes the same positions as the Commissioner but also argues that AMIC is collaterally estopped from challenging the assessment.[12]

## V.  Discussion

The plaintiff raises several constitutional challenges to the Association's actions.  However, prior to addressing the plaintiff's constitutional arguments, it is first appropriate to consider the defendants' argument that this court does not have subject matter jurisdiction over AMIC's complaint.

**A.  Subject Matter Jurisdiction**.  The defendants contend that this court lacks subject matter jurisdiction over the plaintiff's complaint under 42 U.S.C. § 1983 because there was no state action and the Association is not a state actor for purposes of § 1983.  The plaintiff sues the defendants seeking relief under 42 U.S.C. § 1983 alleging constitutional claims and relying on the court's federal question jurisdiction.  *See* 28 U.S.C. § 1331.  No substantive rights are created by § 1983; it merely provides a remedy for deprivations of

---

[11]  The defendants also argue that AMIC is barred by the statute of limitations and/or the doctrine of laches because AMIC should have challenged its membership in 1989 or no later than 1999 when it signed the membership agreement.  In light of its resolution of the defendants' other arguments, the court pretermits discussion of these issues.

[12]  Because the court resolves the other issues in favor of the Association, it is unnecessary for the court to address the Association's collateral estoppel issue.

federal rights created elsewhere.  *Wideman v. Shallowford Cmty Hosp., Inc.*, 826 F.2d 1030 (11th Cir. 1987).  To state a viable claim for relief under § 1983, a plaintiff must assert a deprivation of a right secured by the Constitution or laws of the United States, **and** that the alleged deprivation was committed under color of state law.  "[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Parratt v. Taylor*, 451 U.S. 527 (1981).  However, it is not enough to allege a constitutional violation; the plaintiff must also demonstrate that the alleged constitutional deprivation  was committed by a state actor or that the conduct is fairly attributable to the State.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999); *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993).  Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach "'merely private conduct, no matter how discriminatory or wrongful,'" *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948))."  *Am. Mfrs*, 526 U.S. at 49-50.  The Supreme Court has repeatedly insisted

> that state action requires ***both*** an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' ***and*** that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

*Id*. at 50.  *See also Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) ("to establish a claim for a constitutional violation under 42 U.S.C. § 1983, a plaintiff must establish (1) a violation of a constitutional right and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988)").

The plaintiff alleges that the defendants violated its Fourteenth Amendment rights by depriving it of property without substantive or procedural due process and in violation of its equal protection rights.  Asserting that the $593,560 assessment constitutes a deprivation of property which is arbitrary and capricious and based on a March 31 deadline which is without a rational basis states equal protection and due process claims.  *Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1541 (11th Cir. 1991).  Thus, the plaintiff has sufficiently asserted a deprivation of a right secured by the Constitution or under federal law.

The plaintiff must next establish that the alleged deprivation was caused by a "state actor."  *See Lowe v. Aldridge*, 958 F.2d 1565, 1572 (11th Cir. 1992).  A private party will be considered a state actor only where one of the following conditions is met:

> (1) the State has coerced or at least significantly encouraged the action alleged to have violated the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]" ("nexus/joint action test").

*Rayburn ex rel. Rayburn*, 241 F.3d at 1347 *quoting NBC, Inc. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026-27 (11th Cir. 1988).

14

The defendants argue that the only state action is "the State has from time to time "approved" the articles and plan and those "approved" instruments, in turn, allow the Association's board to devise a voluntary writings credit procedure or rule.  But this is mere regulation that cannot be seen as converting the Association's action in implementing and enforcing its procedure into action to the part of the State itself."  (Br. in Supp. of Mot. for Summ. J. at 32, doc. # 65).   The Supreme Court has held that "state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself."  *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  *See also Loren v. Sasser*, 309 F.3d 1296, 1303 (11th Cir. 2002).

> Our cases have identified a host of factors that can bear on the fairness of [attributing state action.] We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777, when the State provides "significant encouragement, either overt or covert, *ibid*, or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar, supra*, at 941, 102 S.Ct. 2744 (internal quotation marks omitted).  We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State, *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) (*per curiam*), when it has been delegated a public function by the State, cf., *e.g., West v. Atkins, supra,* at 56, 108 S.Ct. 2250; *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-628, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), when it is "entwined with governmental policies," or when the government is "entwined in its management or control," *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

*Brentwood Academy*, 531 U.S. at 296.

While the defendants are correct that "[t]he mere fact that a business is subject to state

regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment," *Blum*, 457 U.S. at 1004 *quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974), the facts of this case demonstrate that there is a "sufficiently close nexus" to treat the actions of the Association as state action.  It is undisputed that, although the Association is an unincorporated non-profit organization, it was created by the Commissioner of Insurance through Department of Insurance Regulation 52 as the "result of a demonstrated need to provide an equitable method whereby adequate fire and extended coverage insurance may be made available in the "Beach Area" of Alabama." (Reg. 52).  In promulgating this regulation, the Commissioner and the Department of Insurance concluded that "this matter [was] of great urgency and concern to the people of the Beach Area of Alabama." (*Id.*)  The parties do not dispute that the Association serves an important public purpose for the State.  *See Evans v. Newton*, 382 U.S. 296, 301 (1966).  Moreover, the State created "the legal framework" governing the Association, and "provided a mantle of authority that enhanced the power" of the Association.  *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

The State, through the Commissioner and the Department of Insurance, requires all insurance carriers seeking to seek insurance in Alabama to be a member of the Association.[13] If an insurance carrier does not join the Association, the Department of Insurance will not grant the carrier a license to sell insurance in Alabama.  The requirement that an insurance

---

[13]   The fact that **all** insurance carriers doing business in Alabama must be a member of the Association also militates in favor of state action.  *See Brentwood Academy*, *supra*.

carrier must be a member of the Association in order to sell insurance in the State militates towards a finding of state action.

The Commissioner approves the area covered by the Association as well as the rates, forms and Plan of Operations for the Association.  (Plan of Operations, Sec. II, ¶¶ 2, 10, 12, 13, 15; Sec. IV, ¶ 5).  The Plan is administered by the Board of Directors, subject to review of the Commissioner.  (*Id*. at Sec. XI, ¶ 1).  The Board of Directors may amend the Plan, subject to the Commissioner's approval.  (*Id*. at Sec. XII, ¶ 10).  The Commissioner can request that the Board meet, and the Board is required to provide the Commissioner with an annual written report of the Association on or before July 1 each year "in such form and detail as the Commissioner may determine."  (*Id*. at Sec. XIII, ¶ 1 and 4).  A final decision of the Board of Directors of the Association is appealed to the Commissioner.  (Plan of Operations, Sec. VIII, ¶ 1)

Moreover, the defendants concede that "the State has from time to time "approved" the articles and plan," "[t]here was State involvement in creating the Association," the State requires insurance carriers to be members of the Association, and the State required AMIC to be a member.[14]  (Doc. # 65, Br. in Supp. of Mot. for Summ. J. at 32-33) Bizarrely, the defendants admit that requiring AMIC to join the Association constitutes state action, even though they argue that this state action is not sufficient for § 1983 purposes. (*Id*. at 33).  This concession, while interesting, is not determinative of the court's jurisdiction because the

---

[14]  Although the defendants assert that "[t]here is no evidence that AMIC actually felt "compelled" to joint" the Association, they acknowledge that "AMIC would have been "required" to join the Association, . . . to act as an insurer in Alabama."  (Br. in Supp. of Mot. for Summ. J. at 33, doc. # 65).

parties cannot confer jurisdiction by consent. *See, e.g., Sosna v. Iowa*, 419 U.S. 393, 398 (1975).

Based on the specific facts of this case, the court concludes that there is a sufficiently close nexus between the State and the Association to fairly attribute state action to the Association. Moreover, although providing insurance is not traditionally exclusively the prerogative of the state, by requiring insurance carriers to be members of the Association, the State has "coerced or at least significantly encouraged" the action that forms the basis of the alleged constitutional violation in this case. In addition, the State, through the Commissioner, has "so far insinuated itself" into the Association that it can be said to be a joint participant. *See Rayburn, ex rel. Rayburn*, *supra*. The court concludes that there exists state action sufficient to satisfy the Fourteenth Amendment.

"If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action "under color of state law" for § 1983 purposes." *Brentwood Academy*, 531 U.S. at 295, n. 2 *citing Lugar*, 457 U.S. at 935. Accordingly, the court has subject matter jurisdiction to resolve the motions for summary judgment.

**B. Statutory Authority**. All of AMIC's claims rest on its basic premise that because the Commissioner and the Department of Insurance did not have specific statutory or legislative authority to create the Association, all actions of the Association including the membership requirement, the March 31 deadline and the ability to make any assessments are unconstitutional. AMIC's premise does not withstand scrutiny.

The Alabama legislature established a department of insurance, ALA CODE § 27-2-1, and designated the Commissioner of Insurance as the chief executive office of the department.  ALA CODE § 27-2-2.  In addition, the Legislate delineated the Commissioner's duties as follows:

(1)  Organize, supervise, and administer the Department of Insurance so that it will perform its lawful functions efficiently and effectively.
(2)  Enforce the provisions of this title.
(3)  Execute the duties imposed upon him or her by this title.
(4)  *Have the powers and authority expressly conferred upon him or her by, or reasonably implied from, the provisions of this title*.
(5)  Sign and execute in the name of the state, by "the state Department of Insurance," all contracts or agreements with the federal government or its agencies, other states or political subdivisions thereof, political subdivisions of this state, or with private persons.
(6)  Conduct such examinations and investigations of insurance matters, in addition to examinations and investigations expressly authorized, as he or she may deem proper to determine whether any person has violated any provision of this title or to secure information useful in the lawful administration of any such provision. The cost of such additional examinations or investigations shall be borne by the state except as otherwise expressly provided.
(7)  Invoke any legal, equitable, or special remedy for the enforcement of orders or the provisions of this title.
(8)  *Have such powers and perform such duties as may be granted to or required of the "superintendent of insurance" of this state under laws remaining in force after the effective date of this title.*
(9)  Have such additional powers and duties as may be provided by other laws of this state.
(10) Not issue a license to a natural person under this title or other law unless the natural person is a United States citizen or, if not a citizen of the United States, a person who is legally present in the United States with appropriate documentation from the federal government.

ALA CODE § 27-2-7 (emphasis added).

The legislature delegated specific powers to the commissioner while also empowering him with additional general authority to perform implied duties.  For example, to fulfill his

19

duties, the Commissioner is authorized to "make reasonable rules and regulations necessary for the effectuation of any provision" of the insurance code. ALA. CODE § 27-2-17. He is also "charged with the duty of the administration of all laws now relating, or hereafter relating, to insurance rates and rating systems of all companies authorized to do business in the State of Alabama, with the exception of rates of life and health and accident business and rates of title insurance." ALA. CODE § 27-13-2. He is authorized to "promulgate such rules and regulations as he may deem necessary to carry out the provisions of this article." ALA. CODE § 27-13-4.

> The commissioner has broad powers, including, but not limited to, the power to require insurers to submit data to aid him in performing his duties (§ 27-13-3); to promulgate rules and regulations necessary to enable him to perform his duties (§ 27-13-4); to license rating organizations (§ 27-13-24); to approve rating systems (§ 27-13-30); to periodically examine business practices and rating practices (§ 27-13-36); and to authorize rate changes (§ 27-13-33 and § 27-13-37).

*Tindle v. State Farm Gen. Ins. Co.*, 826 So. 2d 144, 147 (Ala. Civ. App. 2001)

In addition, ALA. CODE § 27-1-5, requires all persons who transact insurance business in Alabama to comply with all applicable provisions of the Alabama Insurance Code, ALA. CODE § 27-1-1. Consequently, the legislature has given the Commissioner and the Department of Insurance, broad, general plenary power to administer and regulate insurance in the State of Alabama. Acting on that power, the Commissioner implemented Departmental Regulation 52, effective July 10, 1970, creating the Association.

> A Plan known as the Alabama Insurance Underwriting Association, a copy of which is attached to this Regulation and made a part thereof, is hereby established. The Plan is a result of a demonstrated need to provide an

20

equitable method whereby adequate fire and extended coverage insurance may be made available in the "Beach Area" of Alabama.  The Plan provides for the establishment of a "pool" of all licensed insurers writing fire and extended coverage insurance in Alabama, for the purpose of insuring those eligible risks not written on a voluntary basis. . . .

Since this matter is of great urgency and concern to the people of the Beach Area of Alabama you are urged to take prompt action by signing and returning to this office one copy of the Membership Agreement by July 31, 1970.

(Ex. 1, Def's Bell's Mot. for Summ J.).

The creation of the Association falls within the preview of the Commissioner to regulate insurance and protect the public interest in the State of Alabama.[15]  The court concludes that the Commissioner had ample authority under state law to create the Association,[16] and the court now turns to the plaintiff's remaining arguments.

**C. Constitutional Claims**.  The plaintiff repeatedly asserts that the actions of the Association violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Before the court addresses the merits of AMIC's constitutional claims, the

---

[15]  The Plan describes the purpose of the Association.

1.      To provide an adequate market for Fire and Extended Coverage which is necessary to the economic welfare of the Beach area in order to insure its orderly growth and development.

2.      To provide adequate insurance upon property in the Beach area which is necessary to enable home owners and commercial owners to obtain financing for the purchase and improvement of their property.

3.      To provide an equitable Plan to assure an adequate market for Fire and Extended Coverage in the Beach area of Alabama.

(Ex. 1, Def's Bell's Mot. for Summ J.).

[16]  During the 2008 legislative session, the Alabama Legislature adopted S.B. 296 which codified Regulation 52 and expressly authorizes the establishment of the Association.  *See* ALA. CODE § 27-1-24.

court turns to the defendants' argument that because AMIC could have raised the constitutional claims in state court and did not, it is barred from raising the constitutional claims in this forum.[17]   The plaintiff responds that because the Commissioner was without jurisdiction to resolve the constitutional questions,  it was unable to raise the constitutional issues in the Circuit Court of Montgomery County.   The court quickly dispenses with this issue.

The Commissioner was not authorized to render a determination on AMIC's constitutional claims.   Consequently, under Alabama law the Circuit Court was without jurisdiction, in the appeal of the Board's decision, to determine the constitutional claims that AMIC raises in this case.   This is not a case where AMIC instigated a *collateral* suit in conjunction with its appeal of the Board's order.   *See Ex parte Averyt*, 487 So. 2d 912, 913 (Ala. 1986) ("We say this without any degree of equivocation because of the settled proposition that Averyt's collateral suit was not only *proper*, but it was the *only* avenue available for his presentation of the constitutional issues raised therein.") (emphasis in original). *See also Turner v. Mobile County Personnel Board*, 689 So. 2d 168, 169-170 (Ala. Civ. App. 1997) (holding that the circuit court did not have jurisdiction to consider constitutional issues on an appeal of the personnel board's orders.)

> To be sure, the circuit court's consideration of the constitutional issues *was* barred, but for the more fundamental reason that its jurisdiction is limited to a consideration of issues properly raised and made of record before the Board,

---

[17]  The defendants also argue that AMIC has failed to exhaust its administrative remedies.  AMIC is correct that Alabama law is clear that the constitutional claims do not require exhaustion.

> and those do not include constitutional issues.  In other words, only by
> invoking the *general* jurisdiction of the circuit court, by way of a collateral
> suit, could Averyt's constitutional challenges be raised and presented for
> determination.

*Ex parte Averyt*, 487 So. 2d at 914 (emphasis in original).  *See also Dorcena Fire Dist. v.
Rucker*, 564 So. 2d 422, 424 (Ala. 1990) ("In order for this Court to review the
constitutionality of a legislative act, the appellant must have raised that issue in a court below
that had jurisdiction to adjudicate the issue.").  Because the plaintiff can pursue its
constitutional claims in this forum, the court now turns to those claims.

AMIC argues that involuntary membership in the Association deprives them of
property without due process of law, effectuates a taking, denies them equal protection of the
law, and is arbitrary and capricious, all in violation of the Fifth and Fourteenth Amendments
to the United States Constitution.

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth,
> equal protection is not a license for courts to judge the wisdom, fairness, or
> logic of legislative choices.  In areas of social and economic policy, a statutory
> classification that neither proceeds along suspect lines nor infringes
> fundamental constitutional rights must be upheld against equal protection
> challenge if there is any reasonably conceivable state of facts that could
> provide a rational basis for the classification.

*Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.* 508 U.S. 307, 313 (1993).

Because AMIC is attacking the rationality of mandatory membership in the
Association, it bears the burden "to negative every conceivable basis which might support
it."  *Fed. Commc'ns Comm'n*, 508 U.S. at 315.  AMIC fails to meet it burden.  Although
AMIC argues that the defendants' conduct violated its equal protection rights because the

23

regulation creating the Association is arbitrary and capricious and not rationally related to a state interest, it fails to support this claim by demonstrating that it was treated differently from other similarly situated companies or that the Association applied unequally the facially neutral regulation in order to discriminate against AMIC.[18]  *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006).  "The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others.  The test is whether the difference in treatment is an invidious discrimination." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359 (1973).[19]

Despite its rhetoric and hyperbole that the defendants "deprived it of its constitutional rights," to survive the motion for summary judgment, AMIC must present some evidence creating a genuine issue of material fact.  AMIC's broad conclusory arguments are not appropriate substitutes for evidence nor does the argument of counsel rise to the level of admissible evidence.  Consequently, the court concludes that AMIC has failed to demonstrate that there is genuine issue of material fact sufficient to preclude summary judgment on its equal protection claims.

The court next turns to the plaintiff's argument that the March 31 deadline is not

---

[18]  AMIC does not argue that it was discriminated against based on a suspect classification.  Consequently, its claim must be a selective enforcement equal protection claim.  *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313-14 (11th Cir. 2006).

[19]  This is not a case in which AMIC argues that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Westerbrook v. Olech*, 528 U.S. 562, 564 (2000).  The plaintiff points to no evidence that it was treated differently from any other insurance carrier with respect to membership or the March 31 deadline requirement.

rationally related to a legitimate governmental interest, and that no legitimate governmental interest is served by the March 31 deadline.  This issue fares no better.  "Deadlines are inherently arbitrary; fixed dates, however, are often essential to accomplish necessary results."  *United States v. Boyle*, 469 U.S. 241, 249 (1985).  The Association has the power to establish reasonable deadlines.  The fact that the Association could have, but did not, select another date does not render the March 31 deadline unreasonable.  Moreover, the March 31 deadline has not been applied in an arbitrary manner.  The undisputed evidence demonstrates that March 31 has been the deadline for many years and the Association has never waived nor changed the deadline.  The March 31 deadline furthers a legitimate interest in that the voluntary credit reports are filed before the beginning of hurricane season.  There is nothing arbitrary, capricious or unreasonable about the Association conditioning the receipt of a voluntary credit upon compliance with a deadline for filing a report that verifies the entitlement to the credit.  Any burden on AMIC to file the report is minimal compared to the Association's interest in establishing a firm deadline for receipt of the necessary data to calculate the Association's losses and profits for the year.  The March 31 deadlines comes after the end of the year and before the beginning of hurricane season.  Quite simply, the Association's rationale is reasonable.  "What right has any one to complain, when a reasonable time has been given him, if he has not been vigilant in asserting his rights?" *Texaco, Inc. v. Short*, 454 U.S. 516, 526 (1982) *quoting Hawkins v. Barney's Lessee*, 5 Pet. 457, 466, 8 L.Ed. 190 (1831).

The court now turns to AMIC's due process claims.  The due process clause of the

25

Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1. The due process clause "provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11ᵗʰ Cir. 1994) (*en banc*). "'The touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46 (1998) (citations omitted).  *See also Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp*. 531 F.3d 1339, 1346 (11ᵗʰ Cir. 2008).  "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *County of Sacramento*, 523 U.S. at 848.

     To succeed on its substantive due process claim based on the enforcement of the Regulation requiring membership in the Association, AMIC must show that the regulation is not rationally related to the "legitimate general welfare."  *See Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11ᵗʰ Cir. 1995).

> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose – a goal – which the enacting government body *could* have been pursuing.

*Id*. (emphasis in the original).

     The defendants assert, and the plaintiff does not dispute, that the Association was created to provide a mechanism by which landowners in Alabama's coastal areas could

obtain adequate and essential property insurance.  Over the years, insurance companies have become more hesitant to write policies in the coastal area, and the Association has become an "insurer of last resort."  The State has a legitimate government purpose of assuring that its citizens can obtain insurance for their property in the coastal region.

"The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting government body to believe that the legislation would further the hypothesized purpose."  *Id*.  To further the goal of ensuring that property owners could obtain insurance for their coastal properties, the Commissioner requires all property insurance carriers licensed to do business in the State to participate in the Association.  The Commissioner could reasonably expect that absent required membership many insurance carriers would not participate in the Association.  Thus, the court concludes that the membership requirement is rationally related to the State's legitimate purpose and goal of ensuring that property owners in the coastal area can obtain insurance coverage for their properties.

Unless AMIC can demonstrate that the defendants "could not possibly have relied on that purpose," summary judgment in favor of the defendants is appropriate.  *Restigouche, Inc*., 59 F.3d at 1214.  Again, AMIC fails to meet its burden.  AMIC points to no evidence to dispute that the Association "could not have possibly relied on that purpose" in creating and maintaining the Association.  In fact, the defendants offer no other explanation for the continued existence of the Association.

Moreover, in *Cal. State Auto. Ass'n Inter-Insurance Bureau v. Maloney*, 341 U.S. 105 (1951), the Court concluded that the California Insurance Commissioner had the power to

27

require insurance companies doing business in California to participate in a risk pool for motorists and that mandatory participation did not violate the Due Process Clause of the Fourteenth Amendment. *Id*. at 110.

> The case in its broadest reach is one in which the state requires in the public interest each member of a business to assume a pro rata share of a burden which modern conditions have made incident to business. It is therefore not unlike *Noble State Bank v. Haskell*, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, which sustained a state law assessing each state bank for the creation of a depositors' guaranty fund. What was there said about the police power – that it 'extends to all the great public needs' and may be utilized in aid of what the legislative judgment deems necessary to the public welfare, 219 U.S. at page 111, 31 S.Ct. at page 188 – is peculiarly apt when the business of insurance is involved – a business to which the government has long had a 'special relation.' *Osborn v. Ozlin*, 310 U.S. 53, 65, 66, 60 S.Ct. 758, 762, 763, 84 L.Ed. 1074. Here, as in the banking field, the power of the state is broad enough to take over the whole business, leaving no part for private enterprise. *Mountain Timber Co. v. State of Washington*, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685; *Osborn v. Ozlin*, supra, 310 U.S. at page 66, 60 S.Ct. at page 763. The state may therefore hold its hand on condition that local needs be serviced by the business. Osborn v. Ozlin, supra, was such a case; it sustained on that theory Virginia's law requiring Virginia residents to have a share in writing casualty and surety risks in Virginia.

*Id.,* at 109 (footnote omitted).

The court concludes that the defendants' motions for summary judgment on AMIC's substantive due process claims are due to be granted.

To the extent that AMIC argues it was denied procedural due process, this claim also fails. "A § 1983 action alleging a due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994). *See also Foxy Lady, Inc. v. City of Atlanta, Ga.*, 347 F.3d 1232, 1236 (11th Cir.

2003).  The plaintiff has failed to establish that it was denied a constitutionally adequate process.

Both the Regulation establishing the Association and the Association's Plan of Operations and Articles of Agreement provide an appeal process "after any final ruling, action or decision of the Association."  (Reg. 52, Sec. VIII, ¶ 1; Plan of Operations, Sec. VIII, ¶ 1).  The appeals process begins with an appeal to the Board of Directors within thirty (30) days after an adverse decision by the  Association.  (*Id*.).  The Board of Directors' decision may be appealed to the Commissioner of Insurance.   The decision of the Commissioner is "subjected to judicial review as provided by Statute."   (Reg. 52, Sec. VIII, ¶ 3; Plan of Operations, Sec. VIII, ¶ 2).

The procedural history bears repeating.  AMIC failed to file its "Voluntary Writings Credit" claim report by March 31, 2004.  It did not attempt to file the report late nor did it challenge the March 31 deadline.  In October 2004, it was assessed $593,560.  AMIC paid the assessment without protest.  AMIC's efforts to recoup the $593,560 began almost a year after it paid the assessment.  In September 2005, AMIC requested a refund of the assessment. The Association denied AMIC's request on September 28, 2005.  On October 25, 2005, AMIC appealed the Association's denial of the refund to Board of Directors.  The Board of Directors denied AMIC's appeal on November 18, 2005.  AMIC appealed the Board's decision to the Commissioner on December 15, 2005.   The Commissioner held an evidentiary hearing on AMIC's appeal on April 13, 2006.   On June 6, 2006, the Commissioner upheld the Board's decision to deny a refund of the assessment.  AMIC

appealed the Commissioner's decision to the Circuit Court of Montgomery County, Alabama. The Circuit Court upheld the Commissioner's decision and, on August 17, 2007, the Alabama Court of Civil Appeals, affirmed without opinion. Clearly, by availing itself of the appeals process, AMIC received due process. AMIC takes issue with the adequacy of the review process because, according to it, the appeals process does not provide it with a review of its constitutional claims. (Pl's Br. at 20). "Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a property interest." *Cryder*, 24 F.3d at 177. AMIC received all the process it was due. The plaintiff has failed to demonstrate that there exists any genuine issue of material fact sufficient to preclude summary judgment on the defendants' motions for summary judgment regarding its equal protection and due process claims.

**D. Regulatory Taking Claim**. Next, AMIC argues that the $593,560 assessment constitutes an impermissible regulatory taking. Although AMIC contends that its forced participation rises to the level of a *per se* taking, at best, it asserts a regulatory taking. *See Vesta Fire Ins. Corp. v. St. of Fla.*, 141 F.3d 1427, 1431 (11th Cir. 1998). To determine whether AMIC has been subjected to a regulatory taking, the court examines three factors.

> The current standard for evaluating such claims is found in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). In *Connolly*, the Supreme Court recognized three factors that should be considered to identify a regulatory taking: (1) the economic impact of the challenged rule, regulation, or statute on the plaintiff; (2) the extent to which the regulation interferes with investment-backed expectations; and (3) the nature of the challenged action. *See id*. at 224-26, 106 S.Ct. 1026 (citations omitted).

30

*Id.*, at 1431.

First, AMIC contends that the $593, 560 assessment is a sufficient negative economic impact to weigh the first factor in its favor. Undoubtedly, the $593,560 assessment had a negative economic impact on AMIC. However, it was a single assessment that was completely avoidable by AMIC simply filing its Voluntary Writings Credit claim report in a timely manner. More telling however is AMIC's president's testimony regarding his concern for and about the importance of the assessment. According to Wells, "AIUA is, quite frankly, a small blip on the radar." (Dep. Steven Wells at 66). AMIC did not request a waiver of the deadline nor did it ever submit its Voluntary Credit Claim report. AMIC paid the assessment on October 18, 2004, without protest. It was not until almost a year later that AMIC challenged the assessment. Finally, each year there remains the possibility that AMIC will experience a positive economic impact from its participation in the Association, if the Association's annual gains result in a payout to members. For example, as its share of the Association's distribution of operating results, AMIC received for the 2003 operating year, $1,686; $10,490 for the 2001 operating year; and $17,955 for the 2000 operating year. Consequently, the court concludes that AMIC has failed to establish a genuine issue of material fact regarding the negative economic impact of requirement membership in the Association.

Next, the court evaluates the extent that Regulation 52, mandatory participation in the Association, interferes with AMIC's investment-backed expectations. "Interference with investment-backed expectations occurs when an inadequate history of similar government

31

regulation exists; where the earlier regulation does not provide companies with sufficient notice that they may be subject to new or additional regulation" *Vesta Fire Ins. Corp*., 141 F.3d at 1432.   This factor militates against AMIC.   The Association was created by Regulation 52 in 1970, long before AMIC began doing business in Alabama.   AMIC was created in March 1989 and joined the Association in September 1989.   AMIC signed the Association's membership agreement again in 1999.   This is not a case in which membership in the Association was required after AMIC had already entered the insurance market in Alabama.[20]   It is undisputed that AMIC has never asked to withdraw from the Association. AMIC has known about the regulation mandating participation in the Association since AMIC began doing business in Alabama.   It participated in the Association and benefitted from its membership in the Association.   AMIC has failed to demonstrate that there exists a genuine issue of material fact regarding any interference with its investment-backed expectations.

Finally, the court examines the nature of regulation requiring membership in the Association.   It is not enough for AMIC to simply allege the compulsory nature of the regulation constitutes a taking.   "[A]ll government regulation is compulsory in nature.   "[I]t cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another."   *Vesta Fire Ins. Corp.*, 141 F.3d at 1433

---

[20]   While AMIC voted against extending the life of the Association in 2003, it did so simply because it disagreed with composition of the Board of Directors.   Moreover, AMIC voted in 2004 to continue the Association.   In 2006, when AMIC voted against extending the life of the Association, it was in the midst of litigating this matter.

*quoting Connolly*, 475 U.S. at 223.   "But the nature of the state's interest is critical in determining whether a taking has occurred.  *See id*.  When important public interests are served, a taking is less likely to have occurred." *Vesta Fire Ins. Corp*., 141 F.3d at 1433. Clearly, and as already expressed, the State has the power to regulate insurance.  *Id*. Consequently, the court concludes that AMIC has failed to demonstrate that there exists genuine issues of material fact sufficient to preclude summary judgment on its regulatory taking claims.

**E. Dormant Commerce Clause Claim**.  Finally, the plaintiff alleges that requiring membership in the Association violates the Dormant Commerce Clause because forced participation "overly burdens interstate commerce and affects the members' ability to conduct business." (Am. Compl. at § 51, p. 13, doc. # 50).  This claim is patently frivolous.

"[T]he Commerce Clause is inapplicable to the business of insurance." *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 656 (1981).

> Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the McCarran-Ferguson Act, 59 Stat. 33, 15 U.S.C. § 1011 *et seq*., as this Court acknowledged in *State Board of Insurance v. Todd Shipyards Corp*., 370 U.S. 451, 452, 82 S.Ct. 1380, 1381, 8 L.Ed.2d 620 (1962). See also *Group Life & Health Ins. Co., v. Royal Drug Co.*, 440 U.S. 205, 219, n. 18, 99 S.Ct. 1067, 1076 n. 18, 59 L.Ed.2d 261 (1979); *Wilburn Boat Co. v. Firemen's Fund Ins. Co.*, 348 U.S. 310, 319, 75 S.Ct. 368, 373, 99 L.Ed. 337 (1955).

*Id*. at 653.

The law is clear:  "the McCarran-Ferguson Act removes entirely any Commerce Clause restriction upon [a State's] power to tax the insurance business." *Id.* at 654-55.  The

defendants' motions for summary judgment on the claims based on the Dormant Commerce Clause are due to be granted.

**F. State Law Claims**.  Independent of its federal claims, AMIC also seeks to invoke this court's pendent jurisdiction to consider state law claims of breach of contract and exercise of power in excess of authority.  *See* Amended Compl., Cts. 6 & 7.  Having determined that the defendants are entitled to summary judgment on the plaintiff's constitutional claims, the court declines to exercise supplemental jurisdiction of the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  These claims will be dismissed without prejudice.

## IV.  CONCLUSION

Accordingly, for the reasons as stated, it is

ORDERED that the plaintiff's motion for partial summary judgment be and is hereby DENIED and that the defendants' motions for summary judgment on the plaintiff's federal claims be and are hereby GRANTED and that these claims be and are hereby DISMISSED with prejudice.  It is further

ORDERED that the plaintiff's state law claims be and are hereby DISMISSED without prejudice.

A separate final judgment will be entered.

Done this 30th day of September, 2008.

_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

34